IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Criminal Action No. 07-143-JJF |
| | : | |
| CHARLES WARREN | : | |
| | : | |
| Defendant. | : | |

**MEMORDANDUM IN SUPPORT OF DEFENDANT'S
MOTION TO DISMISS INDICTMENT AND
DEFENDANT'S MOTION TO SUPPRESS PHYSICAL EVIDENCE**

Defendant, Charles Warren, by and through his undersigned counsel, Eleni Kousoulis, Assistant Federal Public Defender for the District of Delaware, respectfully submits this Memorandum of Law in support of his Motion to Dismiss Indictment and Motion to Suppress Physical Evidence. For the reasons set forth below, Mr. Warren requests that this Court dismiss the Indictment, or, in the alternative, exclude the Government's admission, at trial, of any and all physical evidence illegally seized by law enforcement officials on or about October 11, 2007.

**I. INTRODUCTION**

On November 6, 2007, the Grand Jury for the District of Delaware returned a two-count Indictment with Notice of Forfeiture, charging Mr. Warren with: (1) knowingly possessing with the intent to distribute more than five grams of a mixture and substance containing a detectable amount of cocaine base, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B); and (2) knowingly possessing a firearm in and affecting interstate commerce, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). On December 17, 2007, Mr. Warren filed a Motion to Dismiss Indictment and a Motion to Suppress Physical Evidence, to which the Government responded on February 1, 2008. On February 6, 2008,

this Court conducted an evidentiary hearing to determine the motions.

Mr. Warren first submits that the Government violated his due process rights because it deliberately failed to preserve evidence that is essential to his defense of the indicted charges. Additionally, Mr. Warren submits that the officers in this matter lacked reasonable suspicion or probable cause to conduct the investigatory stop that led to his seizure, arrest and the subsequent administrative search. Thus, the Government's Indictment should be dismissed, or, in the alternative, all evidence should be suppressed in accordance with the "fruit of the poisonous tree" doctrine expressed in Wong Sun v. United States, 371 U.S. 471 (1963).

## II. FACTUAL BACKGROUND

### A. Evidentiary Hearing Testimony

During the hearing, the Government presented the testimony of: (1) Officer Robert Steele; (2) Officer Kevin Murphy; and (3) Officer Richard Cerminaro. The relevant testimony is summarized as follows.

#### 1. Officer Steele's Testimony

Officer Steele testified that on October 11, 2007, he and Kevin Murphy, his partner, were working the midnight shift when they received a call from Officer Rinehart regarding a fleeing suspect. (Tr. 5, 6, 15). Officer Steele stated that he saw the suspect, identified as Mr. Warren, within a minute of the call and attempted to stop him for "traveling on a bicycle at night without a lighted lamp affixed to the front." (Tr. 6-7, 16-18, 26). Officer Steele testified that this was a violation of the Delaware Motor Vehicle Code, and that officers have the discretion to issue citations or arrest individuals for this non-serious offense. (Tr. 8, 26).

According to Officer Steele, the officers repeatedly ordered Mr. Warren to stop, but he continued to pedal. (Tr. 8, 9, 19-20). Officer Steele also testified that he never noticed a bulge or firearm during the pursuit. (Tr. 20). The officers followed Mr. Warren, and he subsequently "dropped his bicycle and began to flee on foot . . . ." (Tr. 8-9, 19).

Officers Steele, Murphy and Rinehart pursued Mr. Warren on foot, and Officer Murphy subsequently tackled him. (Tr. 10, 21-22). Officer Steele testified that Mr. Warren "immediately went for his waistband," and he deployed his Taser because "he was afraid that [Mr. Warren] was going for a weapon at that point." (Tr. 10-11, 22). Officer Steele further testified that he also gave Mr. Warren a dry stun. (Tr. 11). The officers placed Mr. Warren into custody, conducted a pat-down search and recovered a .38 caliber handgun and single .38 caliber special round. (Tr. 11-12).

Officer Steele testified that Mr. Warren was transported to Wilmington Hospital for medical clearance prior to being transported to the police station. (Tr. 12-13, 23-24). Officer Warren also testified that Mr. Warren had previously given the officers a false name, but he told the officers his real name and date of birth at the hospital. (Tr. 12-13). Mr. Warren was released from the hospital and taken to the Wilmington Police Department for booking. (Tr. 13).

Officer Steele testified that the officers left Mr. Warren's bicycle at the scene of arrest "because of the foot pursuit and the use of force and the weapon recovered." (Tr. 13, 24). Officer Steele testified that neither he nor any of the officers on the scene made an attempt to secure the bicycle, and it was gone when they returned to retrieve it. (Tr. 13-14, 24). Officer Steele also testified that departmental policy requires officers to preserve personal property, and he acknowledged that the officers did not follow this policy. (Tr. 24-25).

Officer Steele further testified that Officer Rinehart contacted Probation and Parole because Mr. Warren was on probation, but he was not present for the search of that residence. (Tr. 14). Officer Steele stated that he was aware that 28 grams of crack cocaine was recovered from his residence. (Tr. 14-15).

### 2. Officer Cerminaro's Testimony

Officer Cerminaro, a probation officer, testified that his partner informed him that the Wilmington Police had arrested Mr. Warren, a Level 3 probationer, for being out past his curfew. (Tr. 30-31). Officer Cerminaro confirmed Mr. Warren's probation and curfew status, and determined that an administrative search was warranted based on the circumstances. (Tr. 31-35). Officer Cerminaro testified that he completed the Probation and Parole arrest search checklist and obtained permission to search Mr. Warren's home from a senior probation officer. (Tr. 36-37). Officer Cerminaro reported to Mr. Warren's listed address, and was assisted by his partner and Officer Rinehart. (Tr. 39).

Upon arrival, the officers made contact with a female tenant, who confirmed that Mr. Warren lived at the residence. (Tr. 39-40). The officers reported to Mr. Warren's bedroom and found an off-white, rock-like substance in a jacket pocket, Mr. Warren's identification in a shoe box, and mail addressed to Mr. Warren (Tr. 40-42, 45-46). The officers later field tested the substance, which tested positive for the presence of cocaine, and was approximately 28 grams in total weight. (Tr. 42).

### III. ARGUMENT

**A. The Government Violated Mr. Warren's Due Process Rights By Failing To Preserve The Bicycle Evidence, Which Provided The Alleged Basis For the Traffic Stop.**

In California v. Trombetta, 467 U.S. 479 (1984), the Supreme Court stated that "[u]nder the Due Process Clause of the Fourteenth Amendment, criminal prosecutions must comport with

4

prevailing notions of fundamental fairness." Id. at 485. The Court explained:

> We have long interpreted this standard of fairness to require that criminal defendants be afforded a meaningful opportunity to present a complete defense. To safeguard that right, the Court has developed "what might loosely be called the area of constitutionally guaranteed access to evidence. Taken together, this group of constitutional privileges delivers exculpatory evidence into the hands of the accused, thereby protecting the innocent from erroneous conviction and ensuring the integrity of our criminal justice system.

Id. (internal citations omitted). Noting that it had never "squarely" addressed the government's duty to take affirmative steps to preserve evidence on behalf of criminal defendants, the Court cautioned that "[w]henever potentially exculpatory evidence is permanently lost, courts face the treacherous task of divining the import of materials whose contents are unknown and, very often, disputed." Id. at 486.

Potentially exculpatory evidence is evidence that "might be expected to play a significant role in the suspect's defense." Id. at 488. "To meet this standard of constitutional materiality, evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." Id. at 489, citing United States v. Agurs, 427 U.S. 97, 109-110 (1976).

In Arizona v. Youngblood, 488 U.S. 51 (1988), the Court further explained that it has "stressed the importance for constitutional purposes of good or bad faith on the part of the Government when the claim is based on loss of evidence attributable to the Government." Id. at 337. The Court held that a criminal defendant must show bad faith by the police to preserve potentially useful evidence to establish a denial of due process. Id.

Mr. Warren submits that the bicycle in this matter is exculpatory evidence that goes to the key issue of whether the officers had reasonable suspicion or probable cause to conduct the traffic stop, which led to his arrest and the administrative search. Without reasonable suspicion or probable cause,

5

the officers had no basis to stop Mr. Warren. Thus, contrary to the Government's argument, the bicycle evidence is directly related to the indicted charges, and plays a significant role in Mr. Warren's ability to defend against these charges.

Mr. Warren submits that on the night of his arrest, his bicycle was in full compliance with Delaware's Motor Vehicle Code, and the police officer's failure to preserve this evidence prevents him from defending against the foundation of the Government's Indictment. The officers in this matter have years of experience and training in the collection of evidence, and they should have preserved the bicycle evidence because it serves as the basis for their decision to stop Mr. Warren.

Indeed, despite several officers being present at the scene of Mr. Warren's arrest, none of these officers took steps to preserve the bicycle. Although the Government argues that the officers may have been neglectful in not doing so, Mr. Warren asserts that the officers' actions were deliberate and in bad faith, as they had no basis to stop him for a traffic violation.

### B. The Officers Lacked Reasonable Suspicion Or Probable Cause To Conduct A Traffic Stop.

The Fourth Amendment protects "the right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures." See U.S. CONST. Amend. IV. The United States Supreme Court noted that "[n]o right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law." Terry v. Ohio, 392 U.S. 1, 9 (1968) (citing Union Pacific R.R. Co. v. Botsford, 141 U.S. 250, 251 (1891)). "As a general rule, the Supreme Court has interpreted the Fourth Amendment's reasonableness requirement to mean that seizures and searches must be based on probable cause and executed pursuant to a search warrant." United States v. Johnson, 238 F.Supp.2d 663 (D.Del. 2002).

6

If an officer does not have a warrant, he or she "may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has reasonable suspicion that criminal activity is afoot." Id., citing United States v. Robertson, 305 F.3d 164 (3d Cir. 2002) (quoting Illinois v. Wardlow, 528 U.S. 119, 123 (2000)); see also United States v. Sharpe, 470 U.S. 675 (1985) (stating that an investigatory Terry stop may ripen into an arrest if the duration of the stop or the amount of force used is "unreasonable"); Wiers v. Barnes, 925 F.Supp. 1079, 1087 (D.Del. 1996) (stating that the Fourth Amendment requires application of the "reasonableness standard" to actions by law enforcement officers, and the test is an objective one: "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.") (citations omitted); United States v. McGrath, 89 F.Supp.2d 569 (E.D. Pa. 2000) (stating that the continued detention of a suspect must be based upon probable cause).

Pursuant to Terry, reasonable suspicion of criminal activity is defined as "specific and articulable facts which, taken together with reasonable inferences from those facts, reasonably warrant that intrusion." Terry, 392 U.S. at 21 (stating that this "demand for specificity in the information upon which police action is predicated is the central teaching of this Court's Fourth Amendment jurisprudence."). In evaluating reasonable suspicion, courts must consider the totality of the circumstances. United States v. Valentine, 232 F.3d 350 (3d Cir. 2000).

In the context of an officer's reasonable suspicion to conduct a traffic stop, although the officers' subjective intent is generally not relevant to the court's determination, the Third Circuit explained in United States v. Delfin-Colfina, 464 F.3d 392 (3d Cir. 2006):

> [A]n officer's Fourth Amendment burden of production is (1) to identify the ordinance or statute that he believed had been violated, and (2) provide specific articulable facts that would support an objective determination of whether any officer

7

       could have possessed reasonable suspicion of the alleged infraction. As long as both prongs are met, an officer's subjective understanding of the law at issue would not be relevant to the court's determination.

Id. at 399-400. Thus, an officer's subjective reasons for conducting a traffic stop are not relevant if the officer identifies the alleged traffic violation <u>and</u> provides specific, articulable facts to support this conclusion.

       In the instant case, the Government has wholly failed to meet its Fourth Amendment burden of production. First, Mr. Warren was not ticketed for the alleged violation at the time of his arrest, and the Government has only offered testimony to support reasonable suspicion in this case. Interestingly, Officer Rinehart, the officer who first observed Mr. Warren on his bicycle, did not testify at the hearing.

       Second, and significantly, none of the officers at the scene secured the bicycle, which would support whether the alleged traffic infraction actually occurred. Mr. Warren's position is that his bicycle was fully compliant and the Government has offered no evidence to contrary.

       The officers lacked reasonable suspicion or probable cause to conduct the traffic stop of Mr. Warren. Accordingly, all evidence, including the firearm and the drugs obtained from the resultant administrative search, must be suppressed as fruit of the poisonous tree. See <u>United States v. Brown</u>, 448 F.3d 239 (2006); <u>Wong-Sun v. United States</u>, 471 U.S. 407 (1963).

## IV. <u>CONCLUSION</u>

For the foregoing reasons, Mr. Warren requests that this Court dismiss the Indictment, or, in the alternative, suppress all physical evidence in this matter because it is the fruit of the officers' unlawful activities.

Respectfully submitted,

/s/ Eleni Kousoulis
Eleni Kousoulis, Esquire
Assistant Federal Public Defender

Attorney for Defendant, Charles Warren

Federal Public Defender
One Customs House
704 King Street, Suite 110
Wilmington, DE 19801
(302) 573-6010
ecf_de@msn.com

Dated: March 7, 2008